This is cause number 24-7009, Roderick Napoleon Harris v. Eric Guerrero. Is the appellant ready to proceed? You may. Good afternoon, and may it please the court. My name is Adam Charnas, and I represent the petitioner, Roderick Harris. Mr. Harris deserves a certificate of appealability for a simple reason. His trial counsel, in preparation for a trial at which his very life was at stake, failed to undertake a reasonable investigation into critical aspects of his mitigation defense. The district court below and the state on appeal contend that his trial lawyers are entitled to deference for their strategic decisions. But as the Supreme Court and this Court have repeatedly said, there can be no legitimate strategy decision that is made without a reasonable and competent investigation that preceded it. And trial counsel here never adequately and competently investigated whether Mr. Harris suffered from fetal alcohol syndrome disorder or blood poisoning. Now this is here on a motion for a certificate of appealability. So all we need to show is, in the words of this Court's decision in Escamilla, that Mr. Harris's arguments are adequate to deserve encouragement to proceed further. And we believe that we have made that showing here. With respect to the reasonable investigation question, I'd like to make three broad points. First, I think it is undisputed that Mr. Harris's trial counsel was on notice both of his mother's extensive alcohol use during pregnancy and Mr. Harris's exposure to lead in utero and as a child. But they never investigated either. They never asked their expert or hired an expert to evaluate Mr. Harris for FASD or for lead exposure. Second, the District Court and the State rely on Dr. McGarrahan's short mid-trial email urging counsel not to pursue mitigation. Indeed, the District Court in its findings said that, quote, the defense's trial strategy was premised on the recommendation of Dr. McGarrahan. To page 494 of the record. There are two fundamental problems with that reliance. The first is the email recommending not to pursue these lines of inquiry and mitigation came in the middle of trial. In fact, it came after the jury's guilty verdict. At that point, it was obviously too late for counsel to follow her recommendation if, for instance, she had been pursuing lead poisoning or alcohol abuse during pregnancy. It was literally in the middle of trial. And second, in any event, she never investigated fetal alcohol syndrome or lead exposure. She never investigated in this case. She had never diagnosed a patient of hers or anybody ever in her career suffering from fetal alcohol syndrome or lead exposure. So it was simply not reasonable for a counsel, for Mr. Harris's counsel to rely on her advice in the middle of trial not to pursue these lines of inquiry. And the third thing I want to comment on with respect to the investigation is what the state says is factors that make this decision reasonable and they point to two things. They say, first of all, if the defense had put in evidence a fetal alcohol syndrome or lead exposure, it would have opened Mr. Harris for the state's experts to examine him and to bring in potentially adverse evidence, for example, a diagnosis of antisocial personality disorder. And second, they say this evidence would be inconsistent with their, what I call their PCP defense. Their defense at the mitigation stage was largely premised on the argument that Mr. Harris would not have access to PCP and therefore he would not be a future danger if sentenced to life in prison rather than to death. And there are two fatal arguments, two fatal problems with these arguments. First, Mr. Harris's trial counsel, lead trial counsel Lohler, contradicted this at the habeas hearing. He expressly testified at the habeas hearing on recross that if he had evidence of fetal alcohol syndrome or of lead exposure, he would have used it in the mitigation case. That's at page 22390 of the record. So he, by that concession, he destroys this argument. The second problem is counsel could not have made a cost-benefit analysis of the fetal alcohol syndrome or lead exposure evidence without fully exploring it. This would be an entirely different case if I hire an expert to fulsomely examine both of these factors, bring them evidence, consider what the trial testimony of the experts would be at the mitigation phase, and then compare it to the downside. This would be an entirely different situation that you were facing. But they didn't do that. They never investigated fetal alcohol syndrome, they never investigated lead exposure, they didn't know what the evidence would show, and therefore they were in no position to balance it against the downsides of opening up Mr. Harris to the state's experts or to undermining their PCP defense. Now, it's not surprising if you look at the record that Mr. Harris' trial counsel did not competently prepare their mitigation defense. There was a shocking lack of preparation for this trial. And there's a lot of data in our brief, but just to mention a couple of things. Lead counsel Lohler, for the first two and a half years after he was appointed to represent Mr. Harris, worked a total of 33 hours in his defense. Thirty-three hours over two and a half years. Second chair Parks worked fewer than 22 hours before voir dire started. And third chair Howard worked fewer than 21 hours before voir dire started. That's just a shocking lack of preparation for a capital trial. It's a shocking lack of preparation for a medium-sized breach of contract dispute, let alone a case in which a man's life was at stake. Mr. Parks, the second chair of trial, prepared the three experts that testified at trial after voir dire had started. So what would someone reasonably expect the number of hours would have been in preparation for a capital case? Well, I don't think there's any sort of magic number, Your Honor. But with a gut, for example- Well, you're telling me that one is shockingly low, so you must be comparing it to some number. Well, I think what the ABA guidelines, with the Texas guidelines, for example, the ABA guidelines say that the preparation for a mitigation case requires extensive and unparalleled investigation into personal and family history. So 30 hours over two years is just plainly inadequate. What you would expect, I think, would be hundreds of hours. It'd be at least a zero added to the amount of time that these lawyers spent in preparing. And the proof is in the pudding. The proof is in what they did not investigate. That they didn't ask their experts to take a look at things that stared them in the face. They knew that the mother drank during pregnancy. They knew she used marijuana during pregnancy. They knew he lived near a Superfund site. They knew the mother testified at the habeas hearing that she ate dirt, presumably contaminated with lead, during her pregnancy. And they investigated none of these things. They didn't ask experts to investigate them. Nobody looked at these things at all. And it's not that counsel, even counsel for a capital defendant, needs to pursue every possible lead to the ends of the earth. This Court's cases say, and the Supreme Court's cases say, that that's obviously not required. But significant mitigating, potentially mitigating circumstances that counsel might want to use a trial, that reasonable counsel would investigate a trial, must be investigated. And as this Court said in Escamilla, for example, some efforts by counsel to investigate and present a mitigation defense don't insulate counsel if, quote, the scope and adequacy was unreasonable. And we think that was clearly the case here. The reason it was obvious is, if you look at Mr. Harris's history, look at his life story, which was available to the defense counsel, which they knew about, he clearly had substantial intellectual deficits. He was held back a grade early in elementary school. He was put in special education early in elementary school. He was diagnosed with ADHD. He was diagnosed with learning disabilities. He had suicidal ideations at an extremely young age. He had hallucinations. There's clearly overwhelming evidence that would have caused reasonable, competent counsel to investigate those things, particularly when alcohol abuse during the pregnancy and exposure to lead before and after birth are explanations for precisely these types of things. In fact, the expert, Dr. McGarrihan, testified that his symptoms were consistent with fetal alcohol syndrome disorders, yet she didn't investigate that. And potentially the reason that the district court made the mistake it did, we believe, is that it had no benchmark to compare against. What I would like to say is this is comparable. The mistake is comparable to sort of a medical malpractice or legal malpractice case. If I am suing my doctor saying he mishandled my appendectomy, the first thing I have to do in court is bringing an expert to testify what the medical standard of care at the time was for treating appendicitis. The expert would say, you have to do A, B, C, and D. And then maybe the defense would have an expert who testifies, no, it's E, F, G, and H. And the jury would determine what the standard of care was and then look to see whether the doctor met that standard. Here, there was no standard of care that the district court used. It simply looked at what the lawyers did and blessed it and said, well, that was enough in these circumstances. And we think that was a mistake. The Supreme Court in Strickland said expressly that it's the obligation of the court, of the district court, to determine whether the lawyers, the trial lawyers, met an objective standard of reasonableness. And Justice Alito said in the Bobby case that the district courts must test counsel's behavior and to, quote, determine the nature of the work that a defense attorney must do in a capital case to meet the obligations imposed by the Constitution. And there was no work by the district court to do that here. The district court never articulated the standard against which the three trial lawyers would be judged to determine whether their conduct was reasonable or not. Before I move on to prejudice, I do want to mention the psychosocial history question. It has been the standard since at least the Wiggins case, which preceded the trial here by a number of years, that defense counsel must create a psychosocial history of the defendant and dig deeply into his background, his upbringing, his medical history, his psychological history, and so forth. I don't think there's any dispute that that wasn't comprehensively done here. Trial counsel introduced some evidence at trial, but they did not have an expert that comprehensively examined the psychosocial history and brought that forth to the jury in a way that made it meaningful. Now, the state argues that we waive this argument and Mr. Harris's federal habeas counsel waived this argument by not expressly discussing it in his habeas petition in the federal district court below. We agree that it wasn't expressly raised in that matter, but we think it's part and parcel of the failure to investigate the alcohol and lead issues. So we would argue it wasn't waived for that reason and it was an open and obvious violation of trial counsel's obligation in preparing for the trial. Would the point of the alcohol and lead issues have been that there was some cognitive impairment? Absolutely, Your Honor. Cognitive impairment that is demonstrated in the record. But then didn't Dr. McGarren say that there was very little evidence of any cognitive impairment? Well, she did opine that, and we think it was unreasonable for Mr. Harris's trial counsel not to press and pursue that further for the reasons that I said a moment ago. I mean, Mr. Harris as a child was held back in like second grade, was in special education from early on. He had hallucinations. He has suicidal ideations. He really was an extremely troubled child, intellectually and psychologically. He suffered extreme abuse in his home. Father beat him regularly, beat his mother. Mother had, everybody concedes, has had no attachment with Mr. Harris as a young child, went out partying after he was born and so forth. So all the indications are there that he had suffered the very cognitive deficits that could be caused by lead and alcohol, and that should have been pursued further. So Dr. McGarren just missed it or was just wrong? I think she missed it or was just wrong, and counsel's obligation was to press her on that, not to just take no for an answer when there were such obvious problems, cognitive and psychological problems with Mr. Harris from a very, very early age. And in fact, the experts, the numerous experts that we brought in in the state habeas case made that point expressly. They said there was no question that he had these cognitive issues. They did an MRI for the first time of his brain and testified that he had significant physical problems with his brain that led to these cognitive questions, cognitive issues and psychological issues. So I think whether she missed it either from lack of effort or for whatever reason, but counsel's obligation is to press that. I mean, a man's life is at stake, and there was just none of the urgency or effort that you would expect in those circumstances that was shown by the defense team. With respect to the prejudice question, prejudice exists if there's a reasonable probability that at least one juror, if this evidence had been presented, would vote for life instead of death. And in fact, since this comes on a motion for a certificate of appealability, we don't actually have to prove that. All we have to prove is that it's a debatable question whether one juror would have voted for life. And it's important for this purposes that Texas is not a weighing state. As we tried to explain in our briefs, and I think it's clearer in our reply brief than in our opening brief, the district court said, well, we have to weigh the aggravating circumstances against the mitigating circumstances, including the new mitigating circumstances brought forth at the state habeas hearing, but that's not the case under Texas law. Texas law uses aggravating circumstances as a gatekeeper. The jury must find that there's one aggravating circumstance to make the defendant death eligible. At that point, it's up to the jury. They can look at the aggravating circumstances. They can look at other factors that were brought forth at trial, or they can just look at the mitigation factor. I think this is clear if you look at the Gonzales case from the Court of Criminal Appeals. And what it basically says is the jury looks at the mitigating factor, whether taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background and personal moral culpability, there are sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than death be imposed. That's the question for prejudice. Would at least one juror, it's a reasonable probability that at least one juror would have said, based on the whole mass of mitigating evidence that was brought forth at the state habeas hearing that was not brought forth at trial, whether at least one juror probably, or there's a possibility that one juror would have voted for life instead of death. And we think that the evidence here of Mr. Harris's upbringing and childhood and cognitive disabilities and abuse is quite similar to the cases where this court and the Supreme Court have reversed death sentences. Cases like Wiggins, Porter v. McCollum, and Rampea. Those cases involve failure to present childhood abuse and neglect, trauma, brain damage, and the like. And that's exactly what the case was here. Finally, I'd like to conclude it with the Stun Belt evidence, because the argument for the Stun Belt evidence is quite different. I've just been talking about inadequate investigation, undermining or meaning that there's no strategic decision made by counsel. Counsel did make a strategic decision with respect to the Stun Belt evidence, but we think that decision was so far out of the bounds of reasonable that it led to ineffective assistance of counsel. As this court said in Neal, we can rebut the presumption that strategic decision was reasonable if, quote, the attorney's representation was unreasonable under prevailing professional norms and the challenged action was not sound strategy. And we think that raising the issue of the quote, unquote, elevator incident was not sound strategy, because it was patently obvious that when counsel raised the fact that Mr. Harris didn't flee from the elevator when he was briefly in the elevator alone, that the state's witness, the courtroom deputy, or the state's lawyers on cross would have raised the fact that Mr. Harris was wearing a Stun Belt that would have zapped him with 75,000 volts of energy if he tried to escape. It was 100% certain, and I think 100 lawyers marched into this courtroom, asked the question, would say it was obvious that the state would have brought up the Stun Belt evidence. And as the Supreme Court and other lower courts have said repeatedly, evidence of things like Stun Belts, mostly in the cases or in the context of restraints like leg irons or handcuffs, showing that to the jury is incredibly detrimental to the defendant. In fact, it's unconstitutional for the prosecution to allow that to happen if it's objected to, because it sends the message to the jury, this defendant is so dangerous, he can't even be sitting in the courtroom without being shackled, or in our case, can't be sitting in a voir dire room without a belt around his waist threatening to zap him with 75,000 volts if he misbehaved. And now the state and the district court said, well, that happened weeks before trial. Well, that's irrelevant. This testimony happened at trial. Each of these jurors was in the voir dire room. I believe voir dire was done in a judge's conference room. Each of them was in there with Mr. Harris, just a few feet away, and was being told at trial that he was so dangerous that sitting in that room with a bailiff behind him and with a judge, that he needed to be threatened with a Stun Belt, 75,000 volts in order to get him to behave. So we think that was powerful, powerful evidence that his trial counsel basically solicited it almost by having the elevator incident testified to when it was perfectly obvious that the rebuttal from the state would be, well, he was wearing a Stun Belt and that's why he didn't run. Every lawyer should have known that was the result and that that would be a powerful message that would be sent to the jury. Unless the court has any further questions, I'll reserve the balance of my time to rebuttal. All right, thank you again. Thank you. Ms. Knoll. May it please the court. Roderick Harris was convicted and sentenced to death for committing murder while in the course of a home invasion robbery. In his COA motion to this court, Mr. Harris now challenges his trial counsel's conduct in relation to his sentencing proceedings. But his trial counsel here conducted a thorough investigation into his background, his life history, his family history and his cognitive and psychological functioning. The cognitive and psychological testing proved to be unhelpful to Mr. Harris at trial. Dr. McGarahan, a neuropsychologist retained by trial counsel, found that there was little to no cognitive impairment. She also had concerns that Mr. Harris easily met the criteria for antisocial personality disorder and that he had showed signs of malingering during his psychological examination, which could be a sign of manipulation in the eyes of the jury. Given this, trial counsel employed a reasonable trial strategy during sentencing. First, to present Mr. Harris' life history as to go to the issue of mitigation and second, to blame Mr. Harris' violence on his PCP use, therefore to undermine the state's case of future dangerousness. To put this strategy into motion, trial counsel called lay witnesses who testified that Mr. Harris was raised by a mother who did not know how to be a parent, that his biological father was in and out of prison and that he was not part of his life, that his stepfather was highly abusive to the family members, that Mr. Harris was diagnosed with ADHD at a young age, that he struggled in school, that he had suicidal ideations at a young age, that if you follow the maternal and paternal lineages in his family, that there was a history of mental illness and despite this, Mr. Harris, according to testimony, remained protective of his family. He tried to protect his brothers from what was going on in the house and he tried to protect his mother from the abuse of his stepfather. Furthermore, trial counsel put on an expert, Dr. Kessner, a psychologist, who listened to that testimony and testified to the jury about the risk factors in Mr. Harris' life that could have predisposed him to violence in adulthood. She also testified to the attachment theory. She also explained to the jury why Mr. Harris' upbringing was not the same as his half-brothers. As to the PCP strategy, trial counsel presented Dr. Roach, pharmacologist at trial, who explained the effects of marijuana and PCP to the jury. In his opinion, once the PCP is removed from someone, someone will become calmer and more in control and that was corroborated by lay witnesses who had observed Mr. Harris before and after his incarceration, that once he was arrested, he did become calmer and in more control. Given this investigation and presentation of evidence, no reasonable jurist could debate that trial counsel conducted a reasonable investigation in Mr. Harris' case. Furthermore, no reasonable jurist could debate that Mr. Harris was not prejudiced here. And before I move on to prejudice, I wanna clarify a couple things for the record, actually, about deficiency. First, Dr. McGarrihan was qualified to diagnose FASD. That's in the record on appeal at 22706. As to Mr. Harris' counsel's contention that Dr. McGarrihan did not give her opinions to trial counsel until mid-trial, that is refuted by the record. That's refuted at 22717 to 718. And there, Dr. McGarrihan said she had multiple conversations with trial counsel in the months leading up to trial about these issues. That email was sent in response to trial counsel's request that Dr. McGarrihan put together a memo or an email to document their thought process or her assessment in this case. But according to Dr. McGarrihan, she had discussed these matters with trial counsel before. Turning to prejudice, I'm very unclear as to what Mr. Harris' current contention is about the weighing, non-weighing issue here. The standard is whether there is a reasonable probability that but for trial counsel's performance, the outcome of the proceedings would have been different. His weighing versus non-weighing argument is waived. He did not raise the same argument in the district court. At page 115 to 116 in the record of appeal, he actually acknowledges the re-weighing standard in the district court. Furthermore, in Andersby, Texas, the Supreme Court applied the re-weighing standard and it should be applied here. I'd like to note that the aggravating circumstances in this case were significant. In the crime for which Mr. Harris was convicted, two victims were shot and killed in the presence of their family. The crime was of a pecuniary nature. Furthermore, as he left the residence, he began a firefight with law enforcement. Even after being shot, he continued to resist arrest. But two weeks prior to this capital murder, he and some co-assailants committed another capital murder. In that instance, they ransacked an apartment where a family was living. They pointed guns at children's heads and the evidence showed that Mr. Harris went upstairs, shot three brothers, and fatally wounded one of them. Given the weight of this aggravating evidence, Mr. Harris cannot show strickling prejudice. That is, he cannot show that when re-weighing the aggravating evidence against the totality of the mitigating evidence, there is a reasonable probability that the outcome would be different. And to briefly address Mr. Harris's other claims, he contends that his trial counsel were ineffective for failing to investigate his psychosocial history. That claim is clearly waived. He did not raise that claim in his federal habeas petition. Alternatively, the claim is conclusory and meritless for the reasons stated in the director's briefing. But if the court has no questions as to the psychosocial claim, I'll move on briefly to the Stun Belt claim. Trial counsel, there is no question that trial counsel went into the elevator incident at trial as a matter of trial strategy. I believe every member of the trial team testified during state habeas that they thought this was strong evidence that Mr. Harris was not a future danger. Weed counsel, Brad Waller, testified that if the state had not called Bailiff-Moorhead, he would have done so himself. As to the Stun Belt testimony itself, the trial counsel did not intentionally elicit the testimony about the Stun Belt. He asked Bailiff-Moorhead to- Wouldn't it be expected? No, Your Honor, not necessarily. He asked- Isn't that a total response to the strategy you're talking about, that he's obviously not danger? The elevator incident, or the Stun Belt, you mean? Why is it that the proposing counsel says that was an inherently dumb strategy? Because, of course, that's gonna be the response. And I'm just wanting your reaction. Sure, I don't think that that's an unreasonable strategy, because even if he was wearing a Stun Belt, it still showed that he did not take hostage, he did not flee. If anything, and I think the lower courts have talked about this, if anything, the Stun Belt testimony out- I'm sorry, that trial counsel reasoned that the importance of the elevator incident outweighed the issue of the Stun Belt, and that's reasonable. It was a very odd occurrence in a capital murder trial for someone to be left alone, without leg irons, without handcuffs on, in an elevator, around court personnel, and still, they returned to the proper floor without incident. Trial counsel, again, this was a strategy. And when he, Bailiff Moorhead, discussed the Stun Belt on the stand, trial counsel testified that in that moment it was unexpected, he did not expect the information about the Stun Belt to come out, but when it did, he thought that it would be confusing to the jury if he interrupted Bailiff Moorhead further. He also thought that- But your point, it was still worth it. It was still worth it. I believe it was still worth it, particularly in light of the fact that the Stun Belt testimony was paired with testimony that implied the Stun Belt was just a matter of standard procedure, right? And that Mr. Harris caused the Bailiff no issues during the entire 12 weeks of her dire, and was nothing but respectful. And again, that he did not cause any issues. By all accounts, he was respectful to the court personnel on the elevator. Even more so, he cannot show prejudice as it comes to this claim. This isn't inherently prejudicial. It's not presumptively prejudicial. Even if this court is looking at a straight due process shackling claim, the court still looks to whether the petitioner can show there is a substantial and injurious effect on the petitioner's proceedings. Therefore, the court should look to the Strickland prejudice standard, weigh the aggravating factors, and look at the Stun Belt testimony in context, and find that no reasonable jurist could debate that there was no prejudice here. As illustrated by the district court's thorough analysis in denying Mr. Harris's claims, Mr. Harris's trial counsel conducted themselves reasonably. They undertook a thorough investigation, and they employed reasonable trial strategies. And Mr. Harris was not prejudiced by their performance. If the court has no further questions, the director would rest on its briefing. This court has previously denied Mr. Harris a COA, and the director respectfully requests that it deny a COA once more. Thank you. Thank you, counsel. Rebuttal. Thank you, Your Honor. I think I'll make three points. First, there was very general testimony about the preparation for the mitigation case before trial related to Dr. McGarrett. They spoke about mitigation for a total of five hours, I think the testimony was, over the years before the trial. There was no specific testimony, the state, I don't believe, cited it in its brief. Specific testimony that Dr. McGarrett had provided this advice about what to do at trial, advice to the lawyers about how to handle the mitigation case before that email. And the timing of the email after the guilty verdict, if you read that email, it seems like a classic CYA email sent to counsel to justify their decision. And as I said, there was no testimony that she had advised this at any time before trial. Second, it is true that during the mitigation case, the defense put three experts on the stand. Those experts were barely prepared by counsel, two hours or less, sometimes together, and none of them examined Mr. Harris. So they talked in generalities based on their view of general issues and what happened when they sought a trial, but they did not examine Mr. Harris, and that testimony, therefore, you can imagine, was not particularly powerful. With respect to the Stun Belt incident, the courtroom deputies, the deputy sheriffs, required Mr. Harris every single day to sign an acknowledgment that he was wearing a Stun Belt that would zap him with 75,000 volts. That testament, the fact that they required that was brought before the jury, and that had to be pressure judicial. The U.S. Supreme Court, in the Dex case, says that shackles, showing the jury shackles is inherently prejudicial, and that has been the law for several decades now. A Stun Belt, I think, is even more prejudicial because of the power of the Stun Belt. And in your honors, I think, as Judge Ho characterized my position here, I think it was perfectly obvious that the response of Deputy Moorhead and the state would be that the reason he didn't flee, the reason he didn't take hostages, the reason he didn't cause trouble was because he was wearing that belt, and that not only totally destroyed the point that his trial lawyers were trying to make, but it also introduced this incredibly prejudicial fact to the jury that he was sitting there wearing a belt like that because the state was so worried about what his behavior would be, and that just reinforced, it emphasized the fact that he would be- Here's the problem for you, though. You acknowledge this is a very, very deferential standard that we're applying here on multiple levels. It's deference under Strickland, it's deference to state habeas proceedings that were subject to AEDPA, et cetera, et cetera, et cetera. Correct. At the end of the day, I suppose counsel's strategy may have been he didn't even try. Now, maybe the stun belt would fail. Right, I'm not saying, I don't know what the percentage chances are, but in other words, I mean, as long as it's some sort of minimally plausible strategy in a case that may have been difficult to win regardless, they thought, you know what? He didn't even try to escape. That says something. Well, I think if that was their strategy, that was- May not have been a great strategy, but I don't know what other options they had. Well, they had options. They didn't pursue the options. We know- Going back to your first claim. Well, with respect to the stun belt, okay, their option was not to present the elevator incident. And as I say, I mean- No, but the point is they're trying to show as minimally, I'll grant you that the probability of success on that argument is not high. That doesn't necessarily mean it was Strickland frivolous. Well, I think if, but for the stun belt rejoinder, I mean, there's no harm in making that argument. I think the jury- You're saying it's devastating once you get the rejoinder. Exactly. The jury was, you know, probably not going to buy the fact that in a courtroom surrounded by lots of people with guns, the odds of him escaping were- What about the fact that standard practice that that information was elicited? Well- At least applied. You know, standard practice to put the stun belt on? I don't- In other words, don't prejudice this guy. We do that for everybody. Well, but that would have been likely the case in a Supreme Court case involving shackles. I mean, it was standard practice to shackle defendants. I don't think that would undermine what the Supreme Court said. It's the reason why we don't let the jury see a defendant shackled in handcuffs or in leg irons, unless there are particular specific reasons why. Is there any case law that it's inherently prejudicial to even talk about it? I think there is. We cited it in our brief and it's, I think what the- The deck is about actually showing it to the jury, right? If I recall correctly. The jurors saw it, yes. Right, right. The jurors didn't see that here. No, well- It's testimony. Yeah, I'm not- That is another step, right? Well, yes. I think it's another step because, but I'm not sure it's a big step because, I mean, you know, shackles- On red file, you know, we're supposed to- The shackles are- It's very deferential to state courts. By definition, sort of at the, you know, handcuffs are at the, you know, are more likely to be seen. The stun belt was under his suit jacket. So it was just something that, you know, there did protrude in the back. If the jurors were looking for it, they could have seen it, but I don't think that's a big difference, the fact that they were talking about it. The key point is the acknowledgment that it was there. The message that it sent- It was not, again, given the state habeas deference that we're supposed to apply under AEDPA, it's not crazy to think, look, when you actually see it yourself, that is extraordinarily evocative. Whereas we're just talking about it, just testimony. It's, anyway, I take your point. No, I understand what you're saying, Your Honor. I think that that, I think that's a, my- This sounds like a state habeas argument as opposed to an AEDPA argument. I mean, I think that's a minor point. I mean, I don't actually know what a stun belt looks like. I can imagine it, but it probably, it may just look like a box. So, you know, so I think it's, the threat to the wearer is substantial, but it may actually look more innocuous than leg irons do, for example, in the sense it's just not as obvious what it is. And I just want to be clear, are you conceding that no juror ever saw the stun belt? I think there's, I think there's no evidence in the record that the juror saw it, yes. All right. I see them out of time. If there are no further questions. Thank you, counsel. Thank you. Court will take this matter under advisement. We are adjourned.